## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

JAMES THOMAS BANGERT,     )
)
       Plaintiff,    )
)
     v.       )   C.A. No. 1:22-cv-01476-SRF
)
MARTIN O'MALLEY,    )
Commissioner of Social Security,   )
)
      Defendant.   )

## MEMORANDUM OPINION

Gary C. Linarducci, LINARDUCCI & BUTLER, PA, New Castle, DE; Karl E. Osterhout, OSTERHOUT BERGER DISABILITY LAW, Oakmont, PA.

      Attorneys for Plaintiff.

David C. Weiss, United States Attorney; Shawn C. Carver, Special Assistant United States Attorney; Tara Czekaj, Special Assistant United States Attorney, SOC. SEC. ADMIN., OFF. OF PROGRAM LITIG., Baltimore, MD.

      Attorneys for Defendant.

Wilmington, DE
December 6, 2024

**FALLON, U.S. MAGISTRATE JUDGE**:

Plaintiff James T. Bangert ("Plaintiff") filed this action pursuant to 42 U.S.C. § 405(g) on November 9, 2022, against defendant Martin O'Malley,[1] the Commissioner of the Social Security Administration (the "Commissioner"). Plaintiff seeks judicial review of the Commissioner's August 17, 2021, final decision, denying Plaintiff's claim for disability insurance benefits ("DIB") under Title II of the Social Security Act (the "Act"), 42 U.S.C. §§ 401–43. Currently before the court are cross-motions for summary judgment filed by Plaintiff and the Commissioner. (D.I. 14; D.I. 18)[2] Plaintiff asks the court to reverse the Commissioner's final decision under sentence four of 42 U.S.C. § 405(g) and remand his case for further administrative proceedings. (D.I. 15) The Commissioner requests the court affirm the Administrative Law Judge's ("ALJ") decision. (D.I. 19)

I.      **JURISDICTION**

This court has jurisdiction over the matter pursuant to 42 U.S.C. § 405(g). On March 13, 2023, the parties consented to the jurisdiction of the undersigned Magistrate Judge to conduct all proceedings in this case, including the entry of final judgment, in accordance with 28 U.S.C. § 636(c) and Federal Rule of Civil Procedure 73. (D.I. 11) For the reasons that follow, Plaintiff's motion for summary judgment is **GRANTED**, and the Commissioner's cross motion is **DENIED**. The case is **REMANDED** for further proceedings consistent with this opinion.

---

[1] Martin O'Malley became the Commissioner of Social Security on December 20, 2023, and was substituted for Kilolo Kijakazi as the Defendant in this action pursuant to Rule 25(d) of the Federal Rules of Civil Procedure. On November 29, 2024, Martin O'Malley resigned as Commissioner, however a new Commissioner has not yet been substituted.

[2] The briefs submitted in support of these motions can be found at D.I. 15 and D.I. 19.

## II.    BACKGROUND

### A. Procedural History

Plaintiff protectively filed a Title II application for DIB on March 29, 2019, alleging a disability onset date of August 18, 2018 ("alleged onset date" or "AOD"). (D.I. 9 at 19)  On March 19, 2020, Plaintiff's initial claim was denied, (*Id.* at 71), and his request for reconsideration was denied on November 19, 2020. (*Id.* at 79)  Thereafter, Plaintiff requested a hearing before an ALJ on December 23, 2020, (*Id.* at 97), and a hearing was held telephonically on July 12, 2021, before Administrative Law Judge, NaKeisha Blount ("ALJ"). (*Id.* at 36, 38–68)  The ALJ issued a decision on August 17, 2021, denying benefits. (*Id.* at 16–30)  On September 27, 2022, the Appeals Council denied Plaintiff's request for review of the ALJ's decision, making the ALJ's decision the final decision of the Commissioner. *See* 20 C.F.R. §§ 404.955, 404.981; *Sims v. Apfel*, 530 U.S. 103, 106–07 (2000); (*Id.* at 5–7).  Plaintiff appealed the ALJ's decision on November 9, 2022. (D.I. 2)  On April 26, 2023, Plaintiff filed his motion for summary judgment. (D.I. 14)  On June 26, 2023, the Commissioner answered and cross-moved for summary judgment. (D.I. 18)  Briefing on the pending motions is now complete and the appeal is ripe for review.

### B. Medical Evidence

Plaintiff was twenty-three (23) years old on the AOD.  (D.I. 9 at 29)  Prior to the AOD, Plaintiff had been diagnosed with generalized anxiety disorder, personality disorder, and autistic disorder by his therapist, Christopher McGlinn, PhD ("Dr. McGlinn"). (*Id.* at 565)  After the AOD, Plaintiff developed symptoms of post-traumatic stress disorder ("PTSD") and acute stress after he was robbed at gunpoint while working at a Rite Aid, where he had been employed for about five years as a cashier. (*Id.* at 375–78)  Plaintiff had been the victim of prior robberies

3

while working at Rite Aid, but this was the only instance in which he was threatened with a firearm. (*Id.*)

The ALJ found at step two of the sequential evaluation process that: "[t]he claimant has the following severe impairments: Asperger's, autistic spectrum disorder, posttraumatic stress disorder (PTSD), depressive disorder, generalized anxiety disorder, and personality disorder." (*Id.* at 21)

The court focuses its summary of the medical evidence on the records relevant to Plaintiff's non-exertional mental impairments, which form the basis of his appeal.

In July of 2017, about thirteen months prior to the AOD, Plaintiff began seeing a psychiatrist, Sebha Husain-Krautter, MD ("Dr. Husain-Krautter") in an outpatient setting approximately every six to eight weeks. (*See id.* at 338–45) Plaintiff continued to see Dr. Husain-Krautter after the AOD through the time of the ALJ's decision. (*See id.* at 345–58) During the course of Plaintiff's treatment, Dr. Husain-Krautter diagnosed Plaintiff with a generalized anxiety disorder, personality disorder, autistic disorder, and after the AOD, PTSD. (*See id.* at 472–73, 476–77)

In August of 2017, Plaintiff began seeing psychotherapist Dr. McGlinn for anxiety. (*Id.* at 563–64) Dr. McGlinn treated Plaintiff for PTSD after the AOD and saw the Plaintiff on a biweekly basis through the time of the ALJ's decision. (*See id.* at 338–58) Dr. McGlinn diagnosed Plaintiff with a generalized anxiety disorder, an unspecified personality disorder, autistic disorder, and after the AOD, PTSD. (*See id.* at 606–11, 612–13)

On August 30, 2018, approximately a week after the AOD, Plaintiff had a psychotherapy session with Dr. McGlinn, where he presented in a "very serious mood." (*Id.* at 610) Dr. McGlinn reported that Plaintiff was held at gunpoint a week prior and that he attempted to return

4

to work but was unable to do so for more than two hours. (*Id.*) Dr. McGlinn reported that Plaintiff was unable to even talk about returning to work without feelings of anxiety and dread. (*Id.*)

The following day, on August 31, 2018, Plaintiff met with Dr. Husain-Krautter and reported being robbed at gunpoint while working. (*Id.* at 375) Dr. Husain-Krautter diagnosed Plaintiff with an acute stress reaction following the robbery. (*Id.* at 376)

Approximately one week later, on September 6, 2018, Plaintiff met with Dr. McGlinn where he presented slightly better than on the previous visit, however, Dr. McGlinn noted he was "extremely anxious and upset about being robbed at gunpoint at work." (*Id.* at 377) Plaintiff reported he has very detailed memories about what happened the night he was robbed, noting, "I can replay it like a video in my mind." (*Id.*) At that time, Dr. McGlinn diagnosed Plaintiff with an acute stress reaction. (*Id.* at 378)

Approximately one month after the AOD, on September 20, 2018, Plaintiff met with Dr. McGlinn and reported difficulty sleeping, apprehension about leaving his home, and panic attacks. (*Id.* at 379)

On October 5, 2018, Plaintiff met with Dr. Husain-Krautter and presented with symptoms "consistent with PTSD." (*Id.* at 381) Dr. Husain-Krautter reported that Plaintiff attempted to go back to work several times but was unable to do so. (*Id.* at 382) At that time, Dr. Husain-Krautter diagnosed Plaintiff with a post-traumatic stress disorder. (*Id.*)

Between October of 2018 and March of 2021, Plaintiff met with Dr. McGlinn approximately forty more times. On October 31, 2018, Plaintiff was described as moderately anxious and depressed and "[m]arkedly [i]ll" based on the Panic Disorder Severity Scale. (*Id.* at 385)

5

On September 7, 2019, Dr. Husain-Krautter noted that Plaintiff was trying to leave the house more and that he had recently driven, albeit with his parents in the car. (*Id.* at 496) On September 26, 2019, during an appointment with Dr. McGlinn, Plaintiff noted that he had driven once by himself to pick his mother up from work and five times total with his parents. (*Id.* at 612) They discussed Plaintiff returning to the workforce and further discussion concerning Plaintiff's return to work continued through the next several sessions. (*See id.* at 618)

On December 14, 2019, Dr. Husain-Krautter noted that Plaintiff was looking into job opportunities that did not require him to interact much with customers. (*Id.* at 500) Dr. Husain-Krautter noted that Plaintiff was still experiencing PTSD symptoms but described his mood as "okay." (*Id.*)

On February 6, 2020, during an appointment with Dr. McGlinn, Plaintiff reported experiencing a panic attack at the supermarket with his mother when an employee engaged in a verbal altercation with a shoplifter. (*Id.* at 626) On April 9, 2020, during an appointment with Dr. McGlinn, Plaintiff reported increased self-isolation, high stress, and nightmares because of the COVID-19 pandemic. (*Id.* at 628) On the July 1, 2020, appointment, Plaintiff reported high levels of stress following his father's hospital admission, including, tension, hyper-alertness, and sleep disturbance. (*Id.* at 636)

### C. Medical Opinion Evidence

State psychological consultant Alex Siegel, PhD, ("Dr. Siegel") conducted a review of Plaintiff's medical records for his initial disability determination on March 29, 2019, and found that he suffered from PTSD, a generalized anxiety disorder, an unspecified personality disorder, and autism spectrum disorder. (D.I. 9 at 76–77) Dr. Siegel believed that Plaintiff could perform "simple, routine, and repetitive tasks in a stable environment." (*Id.* at 77) Dr. Siegel further

found, "claimant is capable of completing routine tasks not requiring close interactions with others." (*Id.*)

Plaintiff met with Robert Cohn, MD ("Dr. Cohn"), on March 21, 2019, and August 13, 2019, in connection with his workers' compensation claim arising from the robbery incident. (*Id.* at 367–74) Dr. Cohn diagnosed Plaintiff with autistic spectrum disorder and PTSD during his initial consultation. (*Id.* at 370) Dr. Cohn opined that Plaintiff could not return to a position requiring direct interaction with the public but it was possible for Plaintiff to pursue a "work at home" position. (*Id.* at 374) Dr. Cohn opined on March 21, 2019, that the diagnosis of autistic spectrum disorder is unrelated to the incident on the AOD, however he did opine that his diagnosis of posttraumatic stress disorder is related to the incident on the AOD. (*Id.*)

On November 3, 2020, Andrew Donohue, DO ("Dr. Donohue"), performed a consultive examination of the Plaintiff, and diagnosed him with autistic disorder, PTSD, agoraphobia, and an unspecified depressive disorder. (*Id.* at 545) Dr. Donohue determined the Plaintiff has a moderately severe limitation of his ability to relate to others. Dr. Donohue opined that his restrictions on ability to attend meetings, work around the house and socialize with friends and neighbors was also moderately severe. (*Id.* at 547) Dr. Donohue noted Plaintiff's degree of deterioration of personal habits and constriction of interests was moderate. (*Id.*) Dr. Donohue concluded that the Plaintiff has a "moderately severe limitation" in performing work requiring frequent contact with others and moderate limitation in performing work where contact with others will be minimal. (*Id.* at 547)

On November 18, 2020, state psychological consultant Carlene Tucker-Okine, PhD ("Dr. Tucker-Okine"), affirmed Dr. Siegel's findings that Plaintiff could not work in close contact with others. (*Id.* at 79) Upon review of Plaintiff's medical records, Dr. Tucker-Okine opined that

Plaintiff exhibited "mild to moderate symptoms of anxiety, autism, trauma, and a personality

disorder." (*Id.* at 82)  Dr. Tucker-Okine stated that Plaintiff was "able to handle routine tasks in

a low contact environment." (*Id.*)

On December 31, 2020, Dr. Husain-Krautter stated in a Psychological Functional

Capacity report that Plaintiff could not perform simple, repetitive tasks for any length of time.

(*Id.* at 550)  Dr. Husain-Krautter wrote in his report that he does not believe that Plaintiff had the

ability to remain "on task" for more than 80% of the day. (*Id.*)  In addition, Dr. Husain-Krautter

wrote that Plaintiff had moderately severe impairments in relating to other people and restriction

on daily activities, as well as moderate impairments in personal habits and constriction of

interests. (*Id.* at 551)

On March 5, 2021, Dr. McGlinn stated in a Psychological Functional Capacity report that

he did not believe that Plaintiff could perform simple, repetitive work for 40 hours a week

without missing more than 2 days of work per month or that Plaintiff could remain "on task" for

at least 80% of the workday. (*Id.* at 553) In addition, Dr. McGlinn noted that Plaintiff had

"severe" impairments in relating to other people, daily activities, personal habits, and

constriction of interests. (*Id.* at 554)

### D. The Administrative Hearing

#### 1. Testimony of the Plaintiff and his Family Members

On July 12, 2021, during the hearing before the ALJ, Plaintiff testified that he lives with

his parents and is unable to leave his home without suffering severe anxiety and panic attacks.

(*See* D.I. 9 at 46–47)  Plaintiff stated he helps around the house by taking care of his two dogs,

emptying the dishwasher, and doing laundry. (*Id.* at 46–47, 51)  Plaintiff spends time reading,

watching videos, and playing video games online with friends. (*Id.* at 50–52)

8

Plaintiff's mother testified at Plaintiff's hearing that Plaintiff's behavior changed dramatically after the AOD. (*Id.* at 55) She testified that Plaintiff cannot leave their home without experiencing panic attacks, is startled by loud noises, and has nightmares. (*Id.* at 55–57) Plaintiff's mother further testified that her son went from being a functional adult to someone who cannot leave the house by himself because of the robbery at gunpoint. (*Id.* at 56)

### 2. Vocational Expert's Testimony

The ALJ posed the following hypothetical to the vocational expert ("VE"):

> [P]lease assume an individual of the [Plaintiff's] age, education, and experience; . . . is able to remember, understand, and carry out simple instructions, but cannot work at a production pace such as assembly line work; is able to make simple work-related decisions and tolerate few changes in a routine work setting; if *the individual can frequently interact with supervisors and coworkers, but only occasional* [sic] *work in tandem or directly with others and only occasionally interact with the public, would such an individual be able to perform the Claimant's past work*[.]

(D.I. 9 at 61–62 (emphasis added))

The VE testified that in that hypothetical, all past work would be precluded. (*Id.* at 62) However, the VE identified occupations such as a router, hand packager, or inventory clerk as jobs available in the national economy that Plaintiff could perform. (*Id.* at 62–63) The VE also testified that his opinion would not change if the individual could never interact with the public. (*Id.* at 64) On cross-examination by Plaintiff's counsel, the VE opined that an individual who met the limitations outlined in the ALJ's hypothetical but could have "occasional" rather than "frequent" interaction with co-workers and supervisors, would be precluded from the jobs he previously identified. (*Id.* at 64–65)

### E. The ALJ's Findings

Based on the entire record, the ALJ determined that Plaintiff was not disabled under the Act for the relevant time period. (D.I. 9 at 19–30) The ALJ found, in pertinent part:

9

1. The claimant meets the insured status requirements of the Social Security Act through December 31, 2023.

2. The claimant has not engaged in substantial gainful activity since August 18, 2018, the alleged onset date (20 C.F.R. § 404.1571 *et seq.*).

3. The claimant has the following severe impairments: Asperger's, autistic spectrum disorder, [PTSD], depressive disorder, generalized anxiety disorder, and personality disorder (20 C.F.R. § 404.1520(c)).

4. The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. §§ 404.1520(d), 404.1525 and 404.1526).

5. [T]he claimant has the residual functional capacity to perform a full range of work at all exertional levels but with the following non-exertional limitations: he can remember, understand, and carry out simple instructions, but cannot work at a production pace such as assembly line work; he can make simple work related decisions; he can tolerate few changes in a routine work setting; he can frequently interact with supervisors and coworkers, but only occasionally work in tandem; and he can never interact with the public.

6. The claimant is unable to perform any past relevant work (20 C.F.R. § 404.1565).

7. The claimant is 23 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date (20 C.F.R. § 404.1563).

8. The claimant has at least a high school education (20 C.F.R. § 404.1564).

9. Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (*See* SSR 82–41 and 20 C.F.R. § Part 404, Subpart P, Appendix 2).

10. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 C.F.R. § 404.1569 and 404.1569(a)).

11. The claimant has not been under a disability, as defined in the Social Security Act, from August 18, 2018, through the date of [the] decision (20 C.F.R. § 404.1520(g)).

(*Id.* at 21–30)

## III.    LEGAL STANDARD

Judicial review of the ALJ's decision is limited to determining whether substantial evidence supports the decision. *See* 42 U.S.C. §§ 405(g), 1383(c)(3); *Biestek v. Berryhill*, 587 U.S. 97, 102–03 (2019). "Substantial evidence means enough relevant evidence that 'a reasonable mind might accept as adequate to support a conclusion.'" *Pearson v. Comm'r of Soc. Sec.*, 839 F. App'x 684, 687 (3d Cir. 2020) (quoting *Biestek*, 587 U.S. at 103). When applying the substantial evidence standard, the court "looks to an existing administrative record and asks whether it contains 'sufficien[t] evidence' to support the agency's factual determinations." *Biestek*, 587 U.S. at 102 (alterations in original) (quoting *Consol. Edison Co. v. N.L.R.B.*, 305 U.S. 197, 229 (1938)). The threshold for satisfying the substantial evidence standard is "not high[,]" requiring "'more than a mere scintilla'" of evidence. *Id.* at 103. Additionally, when reviewing the record for substantial evidence, "we are mindful that we must not substitute our own judgment for that of the fact finder." *Zirnsak v. Colvin*, 777 F.3d 607, 611 (3d Cir. 2014).

## IV.    DISCUSSION

### A. Disability Determination Process

Title II of the Act affords insurance benefits to people who contributed to the program and who have a disability. *See Pearson*, 839 F. App'x at 687 (citing 42 U.S.C. § 423(a)(1)). A claimant is only disabled if his impairments are so severe that he is unable to do his previous work or engage in any other kind of substantial gainful work existing in the national economy. 42 U.S.C. § 423(d)(2)(A); *Barnhart v. Thomas*, 540 U.S. 20, 21–22 (2003). To qualify for DIB, a claimant must establish disability prior to the date they were last insured. 20 C.F.R. § 404.131; *Zirnsak*, 777 F.3d at 611–12. In this case, it is uncontested that the Plaintiff

11

meets the insured status requirements of the Social Security Act through December 31, 2023.

(D.I. 9 at 21)

To determine disability, the Commissioner must perform a five-step analysis. *See* 20 C.F.R. § 404.1520; *Plummer v. Apfel*, 186 F.3d 422, 427–28 (3d Cir. 1999). If the Commissioner makes a finding of disability or non-disability at any point in the sequential process, the Commissioner will not review the claim further. 20 C.F.R. § 404.1520(a)(4). At step one, the Commissioner determines whether the claimant is engaged in any substantial gainful activity. *Id.* at § 404.1520(a)(4)(i). If the claimant is not engaged in substantial gainful activity, step two requires the Commissioner to determine whether the claimant is suffering from a severe impairment or a severe combination of impairments. *Id.* at § 404.1520(a)(4)(ii).

If the claimant's impairments are severe, at step three, the Commissioner compares the claimant's impairments to a list of impairments that are presumed severe enough to preclude any gainful work. *See* 20 C.F.R. § 404.1520(a)(4)(iii); *Plummer*, 186 F.3d at 428. When a claimant's impairment, or its equivalent, matches a listed impairment, the claimant is presumed disabled. *See* 20 C.F.R. § 404.1520(a)(4)(iii). If a claimant's impairment, either singly or in combination, fails to meet or medically equal any listing, the analysis continues to step four and five. *Id.* at § 404.1520(e).

At step four, the ALJ considers whether the claimant retains the residual functional capacity ("RFC") to perform his past relevant work. *See* 20 C.F.R. § 404.1520(a)(4)(iv); *Plummer*, 186 F.3d at 428. A claimant's RFC "measures the most [he] can do despite his limitations." *Zirnsak*, 777 F.3d at 611 (quoting 20 C.F.R. § 404.1545(a)(1)) (internal quotations and alterations omitted). The claimant bears the burden of demonstrating the inability to return to past relevant work. *See Plummer*, 186 F.3d at 428.

12

If the claimant is unable to return to past relevant work, at step five, the Commissioner

must demonstrate that the claimant's impairments do not preclude him from adjusting to any

other available work. *See* 20 C.F.R. § 404.1520(g); *Plummer*, 186 F.3d at 428.  In other words,

the Commissioner must prove that "there are other jobs existing in significant numbers in the

national economy which the claimant can perform, consistent with [his] medical impairments,

age, education, past work experience, and [RFC]." *Plummer*, 186 F.3d at 428.  The ALJ must

analyze the cumulative effect of all the claimant's impairments in determining whether they are

capable of performing work and are not disabled. *See id.*  The ALJ often seeks a vocational

expert's assistance in making this finding. *See id.*

## B.  Whether the ALJ's Decision is Supported by Substantial Evidence

Plaintiff argues that the ALJ did not give proper weight to the opinions of the doctors

evaluating Plaintiff's social limitations and as a result, the ALJ's RFC did not draw a sufficient

connection between the record evidence and the conclusion that Plaintiff can work "frequently"

with supervisors and coworkers on a consistent basis but never with the public.  (D.I. 15 at 12–

17)

### 1.  The ALJ's RFC Is Not Supported by Substantial Evidence

A claimant's RFC is an assessment of the "the most [he] can still do despite [his]

limitations." *See* 20 C.F.R. §§ 404.1545(a)(1), 416.945(a)(1); *Hess v. Comm'r Soc. Sec.*, 931

F.3d 198, 202 (3d. Cir. 2019).  In formulating the RFC, the ALJ "is not required to seek a

separate expert medical opinion." *Mays v. Barnhart*, 78 F. App'x 808, 813 (3d Cir. 2003).

However, when there are competing medical opinions on the record, the ALJ may choose which

one to credit but "cannot reject evidence for no reason or for the wrong reason." *Plummer*, 186

F.3d at 429; *see also Chandler v. Comm'r of Soc. Sec.*, 667 F.3d 356, 361 (3d Cir. 2011).

13

An ALJ must include all credibly established limitations in both the hypothetical questions posed to the VE and in her RFC assessment. *See Watson v. Saul*, C.A. No. 18-880-MN, 2020 WL 2737012, at *10–11 (D. Del. May 26, 2020). "The ALJ—not treating or examining physicians or State agency consultants— must make the ultimate . . . RFC determination[]." *Chandler*, 667 F.3d at 361.

An ALJ is required to consider the persuasiveness of opinions from all medical sources. 20 C.F.R. § 404.1520c(b) ("We will articulate how we considered the medical opinions . . . in your claim according to paragraph (b) of this section."); 20 C.F.R. § 404.1520c(b) ("We will articulate in our determination or decision how persuasive we find all of the medical opinions. . . in your case record."). This means that it is "expect[ed] that the articulation requirements in these final rules will allow [a] subsequent reviewer or a reviewing court to trace the path of an adjudicator's reasoning." *Id.* Under this regulatory framework, an ALJ is not required to give any "specific evidentiary weight, including controlling weight, to any medical opinion(s) ... including those from [a] medical source." 20 C.F.R. §§ 404.1520c(a); 416.920c(a). Instead, the ALJ must consider the persuasiveness of all medical opinions based on the application of five factors: (1) supportability; (2) consistency; (3) relationship with the claimant; (4) specialization; and (5) other factors. *Id.* at §§ 404.1520c(a)–(c), 416.920c(a)–(c).

The ALJ must explain in her decision how she considered the most important factors of "supportability" and "consistency." *Id.* at §§ 404.1520c(b)(2), 416.920c(b)(2). "Rather than assigning weight to medical opinions, [an ALJ] will articulate 'how persuasive' [she] finds the medical opinions." *Id.* at § 416.920c(b).

Accordingly, "[t]he two 'most important factors for determining the persuasiveness of medical opinions are consistency and supportability,' which are the 'same factors' that formed

the foundation of the treating source rule." *Michelle K.*, 527 F. Supp. 3d at 481. An ALJ is specifically required to address these two factors in her decision. *See* 20 C.F.R. § 416.920c(b)(2); *see also Michelle K.*, 527 F. Supp. 3d at 482. "The ALJ may—but is not required to—explain how [she] considered the remaining factors." *Michelle K.*, 527 F. Supp. 3d at 482; *see also* 20 C.F.R. § 416.920c(b)(2). "However, when the ALJ has found two or more medical opinions to be equally well supported and consistent with the record, but not exactly the same, the ALJ must articulate how he or she considered [the remaining] factors. . ." *Michelle K.*, 527 F. Supp. 3d at 482; *see also* 20 C.F.R. § 416.920c(b)(3).

In formulating an RFC, the ALJ must address both the exertional and non-exertional capacities of the individual. *Fargnoli v. Massanari*, 247 F.3d 34, 40 (3d Cir. 2001). Non-exertional capacity refers to "all work-related limitations and restrictions that do not depend on an individual's physical strength," such as limitations which are psychological or mental in nature. *Fargnoli*, 247 F.3d at 40; 20 C.F.R. § 416.945(a)–(c) (listing examples of non-exertional limitations).

At issue in this appeal is whether substantial evidence supports the ALJ's determination in her RFC that the Plaintiff is capable of consistently performing work requiring *frequent* interaction with supervisors and co-workers. Despite the medical evidence indicating the Plaintiff required low contact environments, the ALJ stated in the RFC that "[Plaintiff] can frequently interact with supervisors and coworkers, but only occasionally work in tandem and he can never interact with the public." (D.I. 9 at 20) The ALJ does not demonstrate consistency within her RFC regarding how an individual with moderate or moderately severe limitations can frequently interact with a select group of individuals but not at all with members of the public. (*Id.*)

15

Within the August 17, 2021, final decision, the ALJ found the report of consultive examiner Dr. Donohue persuasive. (*Id.* at 23)  That opinion provided: "the claimant has moderately severe limitations in his ability to relate to other people. . ." (*Id.*)  Dr. Donohue further opined the Plaintiff has "moderately severe limitation in his ability to perform work requiring frequent contact with others and moderate limitation in performing work where contact with others will be minimal." (*Id.*)  The ALJ found the opinion persuasive as to the moderately severe limitation but indicated she reads "moderately severe to fall within the range of moderate." (*Id.*)  The ALJ fails to explain the basis for her re-characterization of these limitations.  Moreover, the ALJ fails to explain how a moderately-severe or moderate limitation on Plaintiff's ability to interact with others would allow for "frequent" interaction with supervisors and co-workers.  As the VE explained, "even a limitation to *occasional interaction* with supervisors, *i.e.*, just over two and a half hours in an eight-hour day, would be *work preclusive. (Id.* at 64–65)

Next, the ALJ found the opinion of Dr. Husain-Krautter "persuasive in part."  The ALJ found: "Dr. Husain-Krautter's opinion persuasive as to mostly moderate and moderately severe limitations with the undersigned reading moderately severe to fall within the range of moderate.  An overall moderate degree of limitation is supported by and consistent with mental status exams." (*Id.* at 23)  The ALJ states that Dr. Husain-Krautter's opinion is unpersuasive as to the limitations regarding inability to perform simple, repetitive work for any length of time or remain on task, as the record does not support such restrictive limitations.  (*Id.*)  In support of this, the ALJ cited to Plaintiff doing chores around the home, helping with his dogs, laundry and playing online video games.  (*Id.*)

The ALJ found the opinions of the state agency consultants, Dr. Siegel, and Dr. Tucker-

16

Okine, persuasive. (*Id.*) In relevant part, the consultants opined that the Plaintiff has "moderate limitation in interact with others, moderate limitation in concentrate, persist, or maintain pace, and moderate limitation in adapt or manage oneself." (*Id.*) (grammatical errors in original) The ALJ stated she: ". . . finds the consultants opinions persuasive as moderate limitations are supported by and consistent with the evidence of record." (*Id.* at 28) The support in the record evidence on which the ALJ relies and references in her decision is commentary from the medical sources who spent sessions discussing with Plaintiff jobs that could be performed in a low social contact environment. (*Id.* at 78)

The ALJ found the opinion of Dr. McGlinn, unpersuasive but does not explain her reason for rejecting the portion of the opinion that the "claimant has severe limitation in his ability to relate to other people[.]" (*Id.* at 24) The ALJ is also silent on how Dr. McGlinn's opinion lacks consistency with the other consultants' opinions as to Plaintiff's moderately severe limitations on interactions with others. (*Id.*)

The Commissioner argues that the ALJ only found the medical opinions partially persuasive, as far as they supported a "moderate" limitation because, "an overall moderate degree of limitation is supported by the consultative exam findings and generally consistent with other mental status exams." (*Id.* at 27) Furthermore, the Commissioner argues that the RFC accounts for Plaintiff's limitations considering Plaintiff's ability to engage in activities outside of his home which he discussed with his therapists. The Commissioner concludes that summary judgment is warranted because the court is not permitted to reweigh the evidence. (D.I. 19)

While the ALJ notes that Plaintiff discussed returning to the workforce in therapy appointments with Dr. Hussain-Krautter, and Dr. McGlinn, the medical records specifically indicate that the kind of jobs the Plaintiff discussed involved no-contact or low-contact work

17

environments.  (D.I. 9 at 608)  Moreover, the state agency consultants who examined Plaintiff

agreed that Plaintiff could return to work, albeit in a low contact environment.  Dr. Siegal noted

that Plaintiff "is capable of completing routine tasks not requiring close interactions with others."

(*Id.* at 78)  Dr. Tucker-Okine noted that Plaintiff "appears to be able to handle routine tasks in a

low contact environment."  (*Id.*)

   The ALJ's RFC assessment must "be accompanied by a clear and satisfactory explanation

of the basis on which it rests." *Fargnoli*, 247 F.3d at 41.  In weighing the evidence, the ALJ must

give some indication of the evidence which they reject and their reason for discounting the

evidence. *Burnett v. Comm'r of Soc. Sec. Admin.*, 220 F.3d 112, 121 (3d Cir. 2000).  "In the

absence of such an indication, the reviewing court cannot tell if significant probative evidence

was not credited or simply ignored." *Cotter v. Harris*, 642 F.2d 700, 705 (3d Cir. 1981).

   Here, the ALJ acknowledged as persuasive the limitations on Plaintiff's ability to interact

with others as described by Dr. Husain-Krautter and Dr. Donohue.  (*Id.* at 23)  To the extent the

doctors opined that the Plaintiff has moderately severe limitations on interacting with others, the

ALJ chose instead to interpret such limitations as "moderate" without an explanation other than

noting occasions in the record where "[Plaintiff] often presented as friendly, communicative,

cooperative, and causally groomed with intact language skills, appropriate thought content, intact

and logical associations, and no apparent signs of any psychotic process." (*Id.*)  But "[f]or a

person, such as [Plaintiff], who suffers from an affective or personality disorder marked by

anxiety, the work environment is completely different from home or a mental health clinic."

*Morales*, 225 F.3d at 319.

   The ALJ's determination that the Plaintiff has the residual functional capacity to

"frequently interact with supervisors and co-workers" is not supported by substantial evidence,

namely, the social limitations expressed by the medical providers that the ALJ found persuasive.
(D.I. 9 at 17)  "Frequent" as defined by the SSA, means occurring from one-third to two-thirds of
the workday. *Villarreal v. Colvin*, 221 F. Supp. 3d 835, 849 (W.D. Tex. 2016) (quoting SSR 83–
10).  Whereas, "occasionally" means occurring from very little up to one-third of the time.  *Id.*
The ALJ has not cited any evidence in the medical record that would support the Plaintiff's
capacity for work with supervisors and coworkers for two-thirds of the workday.  Moreover, the
ALJ does not address how an individual who is not capable of any social interaction with the
public while at work can, nonetheless, frequently interact with others so long as they are
supervisors or co-employees.

Accordingly, the court finds no logical connection exists between the medical opinions
the ALJ found persuasive and the RFC.  *See Kathleen K. v. Kijakazi*, 2021 WL 4551335, at *6–7
(D.N.J. Oct. 5, 2021) (reversing and remanding a decision finding that the plaintiff could
"frequent[ly] interact[] with supervisors, coworkers, and the public" when the ALJ did not
address the RFC's inconsistency with the plaintiff's medical provider's opinions)) *see also, e.g.,*
*S.B. v. Comm'r of Soc. Sec.*, Civil No. 20-14192-RBK, 2022 WL 16701880, at *3 (D.N.J. Feb.
15, 2022) (remanding where the ALJ assessed moderate social limitations in the plaintiff's
ability to interact with others, but crafted an RFC in which plaintiff "maintains contact frequently
with supervisors and coworkers while successfully completing a 30-day training period"); *Weber*
*v. Saul*, Civil No. 19-448-WMC, 2021 WL 99988, at *6–7 (W.D. Wis. Jan. 12, 2021)
(remanding where "the ALJ here found that Weber had marked limitations in interacting with
others" and accordingly "limited plaintiff to 'no more than occasional direct interaction with
supervisors, coworkers, and the public,' but inexplicably carved out an initial training period,
during which she found Weber could tolerate 'frequent or constant contact with supervisors or

19

coworkers'"—without providing "any explanation" as to why she believed that the claimant

could tolerate frequent or constant contact with others during a training period) (emphasis in

original) (internal citations omitted).

### 2. The VE's Testimony is Based Upon an Improperly Formulated RFC

"Testimony of vocational experts in disability determination proceedings typically

includes, and often centers upon, one or more hypothetical questions posed by the ALJ to the

vocational expert." *Zirnsak*, 777 F.3d at 614 (citing *Podedworny v. Harris*, 745 F.2d 210, 218

(3d Cir. 1984)). The hypothetical must "accurately portray" any impairments of the claimant.

*Id.* (citing *Rutherford*, 399 F.3d at 554). To accurately portray a claimant's impairments, the ALJ

must include all "credibly established limitations" in the hypothetical. *Id.* (citing *Plummer*, 186

F.3d at 431). If the VE's testimony is elicited on a defective or inaccurate RFC, it cannot be said

to be supported by substantial evidence. *Id.*

In this case, the hypothetical posed to the VE allowed for the *occasional* interaction with

the public, while the RFC formulated by the ALJ allowed for *no* interaction with the public. (*Id.*

at 24) (stating Plaintiff can ". . . never interact with the public.")

> . . . if the individual can frequently interact with supervisors and coworkers, but
> only occasional [sic] work in tandem or directly with others and *only occasionally*
> *interact with the public*, would such an individual be able to perform the Claimant's
> past work[.]

(*Id.* at 61–62) (emphasis added)

The VE testified that in that hypothetical, all past work of Plaintiff would be precluded.

(*Id.* at 62) However, the VE testified that occupations such as a router, hand packager, and

inventory clerk, as possible jobs available in the national economy that Plaintiff could perform in

accordance with the ALJ's hypothetical. (*Id.* at 62–63) Critically, this testimony was elicited on

an erroneous hypothetical from the ALJ, which did accurately represent the limitations in the

ALJ's final RFC. (*Id.* at 24)  This further highlights the confusion in the record as to the extent of Plaintiff's capacity to interact with others in a work environment.

Moreover, when Plaintiff's counsel asked if the VE's opinion would change if the amount of time Plaintiff could spend interacting with supervisors and coworkers was lessened from "frequent" to "occasional," the VE agreed that such a limitation would be "work preclusive." (*Id.* at 64–65)  The VE explained that even though some jobs will not require contact with supervisors and coworkers after the initial training period, Plaintiff would still need to interact with others substantially when he was first hired and throughout the training process. (*Id.*)

For the reasons stated in the preceding section, *supra*, § IV.B.1, the RFC does not accurately account for the limitations on the Plaintiff's ability to interact with others. Additionally, the VE's testimony is based upon a hypothetical that does not accurately represent the RFC.

Accordingly, the court finds that the ALJ's decision to deny Plaintiff's request for disability benefits is not supported by substantial evidence. *See Cotter*, 642 F.2d at 706 (stating that substantial evidence exists only "in relationship to all the other evidence in the record"). Evidence is not considered "substantial" if "it is overwhelmed by other evidence," and "ignores, or fails to resolve, a conflict created by countervailing evidence." *Wallace v. Sec'y of Health & Human Servs.*, 722 F.2d 1150, 1153 (3d Cir. 1983) (citation omitted).

## V.    CONCLUSION

For the reasons outlined in this opinion, **IT IS HEREBY ORDERED** Plaintiff's motion for summary judgment (D.I. 14) is **GRANTED,** and the Commissioner's cross-motion for summary judgment (D.I. 18) is **DENIED**.  The case is **REVERSED AND REMANDED** to the

SSA for proceedings consistent with the following:

1) The ALJ shall explain, with citation to the record evidence, how the Plaintiff's "moderately severe" impairments, on social interaction which the ALJ found largely undisputed, are consistent with an RFC assessment that Plaintiff can "frequently interact with supervisors and co-workers." (D.I. 9 at 24)

2) The ALJ shall further explain what evidence in the record supports the distinction in the RFC for frequent interaction in the workplace with supervisors and co-workers but no contact at all with the public and how such a finding is not internally inconsistent.

An Order consistent with this Memorandum Opinion shall issue.